UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| S.Y., by and through her parents, R.Y. and D.Y., <br><br> Plaintiff, <br><br> v. <br><br> Aetna Life Insurance Company, <br><br> Defendant. | Case No. 7:22-cv-09862 (VB) |

## ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT BY DEFENDANT AETNA LIFE INSURANCE COMPANY

Aetna Life Insurance Company, (hereinafter "Aetna" or "Defendant"), by and through its undersigned counsel, hereby submits this Answer and Affirmative Defenses to the Complaint filed by S.Y. ("Plaintiff").

## AETNA'S PRELIMINARY STATEMENT

Plaintiff's Complaint relates to claims for the payment of medical services allegedly provided to S.Y.[1] according to health plans insured or administered by Aetna. Per the Complaint, Plaintiff is seeking additional funds from Defendant for S.Y.'s residential mental health treatment. (Compl. pp. 22-23, ¶¶ 1-2). Aetna asserts that all coverage and payment (if any) was made correctly under the applicable health plans. It therefore denies any and all liability and/or damages. Any statements in the Answer should be interpreted in accordance with this general denial.

---

[1] According to the Complaint, S.Y. is a minor and dependent of R.Y. and D.Y. (*See* Compl. ¶ 1).

## THE PARTIES[2]

1.     Plaintiff. Plaintiff S.Y. is a minor and dependent of R.Y. and D.Y. and is a resident of Westchester County, New York. S.Y. is a beneficiary of the Plan as defined by ERISA § 3(8), 29 U.S.C. § 1002(8).

**ANSWER:** Admitted in part, Denied in part. Defendant admits only that S.Y. was a beneficiary of the group policies ("Plans") identified in ¶ 3. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and denies same. The allegations of this paragraph also constitute legal conclusions to which no response is required.

2.     S.Y. is diagnosed with pervasive, severe mental illnesses, including, inter alia, Developmental Trauma with an Elevated ACE (Adverse Childhood Experience) score, Reactive Attachment Disorder, Disruptive Mood Dysregulation Disorder, Attention Deficit Disorder, and additional learning disorders. From September 14, 2020, through January 17, 2022, S.Y. received medically necessary residential treatment for mental illness at Intermountain, a licensed residential treatment center ("RTC").

**ANSWER:** Admitted in part, Denied in part.  Defendant admits only that Defendant received healthcare claim forms indicating that S.Y. received certain services at Intermountain. As to the remaining allegations, Defendant is without knowledge or information sufficient to form a belief as to the truth of those allegations and denies same.  To the extent that the remaining allegations refer to medical records or documents, they are denied because the medical records or documents speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

3.     Defendant Aetna. At all relevant times, S.Y. received her health coverage through the Plan, which was insured by Aetna through group policy GP-868062-15-008 from September 2020 until October 2020 and then through group policy GP-0169538-011-00035 from November 2020 through January 2022. On behalf of the Plan, Aetna made the decisions to cover five months of Intermountain's treatment of S.Y. at the out-of-network level and deny the coverage of eleven

---

[2] Defendant has included the headings listed in Plaintiff's Complaint to assist in reading this pleading and to assist in cross-referencing Defendant's Answer with the Complaint.  Defendant does not admit the accuracy of any heading. To the extent that any heading can be construed as a factual allegation, that allegation is denied. Further, Defendant omits any emphasis included in the text of Plaintiff's pleading.

months of Intermountain's treatment of S.Y. In that capacity Aetna is a fiduciary to S.Y. under ERISA.

**ANSWER:** Admitted in part, Denied in part. Defendant admits only that S.Y. was a beneficiary of the identified Plans during the relevant time period. All further allegations are denied as vague because they do not refer to any specific dates and responses.  Aetna refers to all relevant documents for their true and correct contents and denies Plaintiff's characterization of same.

<u>**JURISDICTION AND VENUE**</u>

4.      Jurisdiction of this Court arises pursuant to ERISA, 29 U.S.C. § 1001, *et seq.*, 29 U.S.C. § 1132(a)(1)(B), (3) and (e)(1).

**ANSWER:** Admitted.

5.      Venue is proper under 29 U.S.C. § 1132(e)(2) because, *inter alia*, the Plan is administered in this district and the breach took place in this district.

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no response is required.

6.      In conformity with 29 U.S.C. §1132(h), S.Y. has served this Complaint by Certified Mail on the Secretary of Labor and the Secretary of Treasury.

**ANSWER:** Denied. After reasonable investigation, Aetna is without sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and denies same.

<u>**STATEMENT OF FACTS**</u>

7.      At all times material, S.Y. received her health coverage under the Plan and was an ERISA beneficiary under the Plan. As a beneficiary, S.Y. is entitled to the health benefits set forth in the Plan, including medically necessary treatment of mental illness delivered by an RTC licensed facility in accordance with the Plan.

**ANSWER:** Admitted in part, Denied in part. Defendant admits only that S.Y. was a beneficiary of the identified Plans. The remaining allegations are denied because the referenced Plans speak for itself, and Defendant refers to it for its true and correct contents.

**8.**     S.Y.'s parents were aware when they adopted S.Y. from an orphanage in Taiwan as a toddler that she would require extensive medical intervention and support. S.Y. exhibited signs of malnourishment and developmental delay upon her move from Taiwan to New York at the age of 20 months. Therefore, in consultation with treating providers, they provided S.Y., inter alia, expert medical and nutritional treatment, occupational and speech therapy and, beginning in early childhood, mental health treatment, and academic support.

**ANSWER:** Denied. After reasonable investigation, Defendant lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 8.

**9.**     Despite early treatment and other interventions and her parents' steadfast devotion to parenting S.Y., S.Y. has exhibited symptoms of mental illness throughout childhood, including mood dysregulation, defiance, temper tantrums, impulsivity, extreme verbal and violent physical aggression, including toward family members, and social difficulties and resulting social isolation. These symptoms persisted and worsened despite treatment by a host of medical and mental health providers and an individualized education plan.

**ANSWER:** Denied. After reasonable investigation, Defendant lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 9.

**10.**     Therefore, upon the advice of experts, including a psychiatrist, psychologist, physicians, and an educational consultant, on or about June 23, 2020, S.Y. was admitted to SUWS of the Carolinas, an intermediate sub-acute mental health treatment program.

**ANSWER:** Denied. After reasonable investigation, Defendant lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 10. To the extent that the

remaining allegations refer to medical records or documents, they are denied because the medical

records or documents speak for themselves, to the extent they exist, and Defendant refers to them

for their true and correct contents.

**11.**     S.Y. was treated at SUWs for eleven weeks, through September 10, 2020. The Plan then paid 100% of what it deemed reasonable, based on the Plan's acknowledgment of the severe mental health needs of S.Y. This payment structure by the Plan, although less than 50% of the actual costs, would constitute the Plan paying SUWS, an out-of-network facility, as an in-network program, and therefore, the Plan also had to agree that there was not an in-network facility available or appropriate for S.Y.'s mental health needs. Her parents had to pay the significant remainder of the costs of S.Y.'s treatment at SUWS.

**ANSWER:** Denied. After reasonable investigation, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10. To the extent that the remaining allegations refer to medical records or documents, they are denied because the medical records or documents speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents. Defendant specifically denies Plaintiff's characterization of how SUWS was paid and how the Plans were applied or administered.

12.     On September 10, 2020, S.Y. was discharged from SUWS and, upon the advice of appropriate experts, including her treatment team at SUWS, psychiatrists, psychologists, and an educational consultant, transported and admitted to Intermountain, where she received additional mental health treatment at the RTC level of care from September 14, 2020, through January 13, 2022.

**ANSWER:** Denied. After reasonable investigation, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10. To the extent that the remaining allegations refer to medical records or documents, they are denied because the medical records or documents speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

13.     On or about September 2020, and in subsequent communications, S.Y., through her parents and Intermountain, requested that the Plan cover Intermountain's treatment of S.Y.

**ANSWER:** Denied. The allegations of this paragraph are denied.

14.     Aetna, on behalf of the Plan, approved coverage from September 14, 2020, through February 2, 2021, concluding that Intermountain's RTC treatment was medically necessary for S.Y. Aetna, however, provided coverage at the out-of-network level (70 percent, after deductible, rather than at the more favorable in-network level (100% less $350 per day for the first three days of treatment with no deductible, as per the Plan's benefits schedule) even though no in-network RTC could provide S.Y. appropriate, medically necessary mental health treatment.

**ANSWER:** Admitted in Part, Denied in Part.  It is admitted only that Aetna covered and paid claims for alleged services from September 14, 2020, through February 2, 2021 as per the Plans' terms.  All further allegations are denied.

15.     It is notable that in-network RTCs provided to the family by Aetna were considered, however, all were found to be grossly inappropriate based on S.Y.'s gender, age, lack of substance abuse and her other specific diagnoses.

**ANSWER:** Denied. The allegations of this paragraph are denied.

16.     Aetna denied all coverage of Intermountain's treatment of S.Y. effective February 3, 2021.

**ANSWER:** Denied.  The allegations of this paragraph are denied as stated and framed.

17.     Aetna asserted in its February 5, 2021, letter informing S.Y. of its adverse benefit decision, *inter alia*:

> We reviewed information received about your condition and circumstances. We used the Level of Care Assessment Tool (LOCAT) guidelines for residential treatment. Based on LOCAT criteria and the information we have, we are denying coverage for the requested level of care. The information received does not show that you have very poor judgment or thinking and that you may or have hurt yourself or put your life at risk. Treatment could be provided at a less intensive level of care or in another setting.

> (Medical Necessity Denial) This coverage denial was based on the terms of the member's benefit plan document (such as the Certificate of Coverage or benefit plan booklet-handbook, including any amendments or riders). The plan does not cover services that are not medically necessary. Please see the reference to non-medically necessary services listed in the Exclusions section of the benefit plan document or refer to the description of medically necessary services in the Definitions or Glossary section of the benefit plan document.

**ANSWER:** Denied. The allegations refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents. Defendant denies Plaintiff's characterization of same.

18.     Tellingly, on February 11, 2021, within a week of Aetna's denial decision, S.Y. "[a]ttempted to throw an object at [her therapist's] face and then destroyed [her] office…" and had to be separated from her therapist by a very large adult male to ensure the therapist's safety.

**ANSWER:** Denied. The allegations refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents. Defendant denies Plaintiff's characterization of same.

**19.**     On or about April 28, 2021, S.Y., through her parents, appealed Aetna's adverse benefit determinations pursuant to ERISA.

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents. Defendant

denies Plaintiff's characterization of same.

**20.**     S.Y.'s appeal included, inter alia, a 14-page letter by S.Y.'s parents, dated April 28, 2021, describing S.Y.'s difficulties and their efforts to provide her appropriate treatment; a letter by S.Y.'s treating psychiatrist, Dr. Ilene Rabinowitz, dated March 11, 2021, describing S.Y.'s symptoms, treatment history and explaining why Intermountain's treatment was medically necessary; SUWS's clinical treatment record (June through September 2020); and Intermountain's clinical treatment record from September 2020 through April 2021.

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

**21.**     S.Y.'s parents explained in their letter that S.Y. had suffered "numerous abrupt, traumatic losses, neglect, and abuse … in her young life" since placement "in an orphanage at one month of age," where she had been subject to "verbal and physical abuse" by orphanage staff, and had not received "basic levels of nourishment," or "any constancy in care" and had been neglected.

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

**22.**     They further stated that "these abysmal conditions left [S.Y.] globally delayed and emotionally scarred" and that upon her adoption "[a]t twenty months of age, [S.Y.] was unable to walk, talk, or feed herself" and "had a flat affect and was frequently fearful, rarely smiling."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

23.     S.Y.'s parents explained that when they adopted S.Y., they were "cognizant of S.Y.'s dire need for a loving home, consistent care and nurturing, appropriate, and sufficient nourishment, and intensive physical, occupational, and speech therapy" and that at home, S.Y. "would cry and throw tantrums frequently and for extended periods of time" and "could not sleep alone or through the night, and would wake up screaming nightly…need[ing]to eat often…like a newborn baby."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

24.     The parents further explained that they "took [S.Y.] to numerous specialists, including an adoption specialist, a developmental behaviorist, and an early intervention team, which involved multiple therapists" and "had social services and special education teachers working with [S.Y.] and with the family to assist with [S.Y.'s] developmental delays and emotional trauma."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

25.     S.Y.'s parents explained that the "tantrums and emotional distress increased in intensity and duration" and that up until the time of [S.Y.'s] admission to Intermountain, S.Y. "would have complete meltdowns expected of a child who was three to four years old," and "often screamed at …family, threw dangerous objects (including scissors) across the room, and damaged property." "As [S.Y.] got older," they explained, "the "physical and aggressive behaviors toward [S.Y.'s] family increased and [S.Y.] physically threatened her mother."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

26.     S.Y.'s parents further explained that despite "professional help from a number of different child psychologists," "years working with a child neurologist and a child psychiatrist with multiple medication trials," [S.Y.'s] "defiance and anger continued to be explosive at home" and that during the "2019-2020 school year, [S.Y.'s] social relationships began to be affected by [S.Y.'s] impulsivity and lack of emotional awareness."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

27.     They explained that "S.Y. "was not safe at home" and that they "were advised we needed to explore residential treatment to work on her numerous challenges and…emotional dysregulation."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

28.     Dr. Rabinowitz, explained in her letter dated March 11, 2021, also provided in S.Y.'s appeal, that an "array of diagnoses" had "led to myriad emotional, behavioral and developmental consequences . . . ."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

29.     Dr. Rabinowitz also explained that S.Y. had exhibited "multiple and severe temper outbursts at home characterized by verbal and physical aggression towards her parents; a chronically and easily ignited irritable and angry mood; difficulties with peer and other adult relationships stemming from this severe mood disturbance."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

30.     Dr. Rabinowitz further explained that S.Y. had received "[c]omprehensive evidenced based medical treatment for this mood disturbance" and that the family had "regularly participated in a cognitively behaviorally focused individual, parent and family therapy with a PhD level clinician specialized in Child Psychology" and that, in consultation with clinical providers, "behavioral interventions had been implemented at school "to help [S.Y.] best learn and function."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

31.     Dr. Rabinowitz stated that medication trials had had "only fair to minimal effect." that "[e]ven careful polypharmacy to target mood, impulsivity, hyperactivity had yielded little significant benefit to overall functioning," and that S.Y.'s "disruptive, dangerous and frequent physical and emotional outbursts [had] continued at home."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

32.     Citing medical literature, Dr. Rabinowitz explained that "relevant to [S.Y.'s] clinical profile, a poorer clinical course and outcome for children with both DMDD [Disruptive Mood Dysregulation Disorder] and childhood abuse and neglect…has been found," and that "[i]rritability and emotional and behavioral dysregulation are characteristic of children with exposure to such neglect; even in the absence of a formal diagnosis of either Post Traumatic Stress or DMDD."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

33.     Dr. Rabinowitz opined that S.Y. displays clinical symptoms of attachment disorder, including "violent episodes of often unexplained or minimally provoked irritability or sadness," which "have been a persistent thread throughout her childhood thus far," and that S.Y. "has been physically combative and irascible," which "has been…harmful to her social and emotional growth; as she has not been able to achieve the appropriate developmental milestones of establishing trusting adult relationships; developing empathy; forming and sustaining friendships."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

34.     Dr. Rabinowitz explained that despite S.Y.'s receipt of "evidence based treatment" for "myriad Psychiatric, Psychological and academic difficulties" by "a multimodal team of therapists, a Psychiatrist, educators and other treatment professionals," S.Y. had "continued to display violent outbursts," and "was rapidly clinically declining, languishing in poor functioning" and that S.Y.'s "physical safety [was] in question at times" and that "consideration for residential treatment was made only after extensive assessment and consultation amongst the clinical team members" and "was directed by the recommendations of [S.Y.'s] team of clinicians."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

35.     Dr. Rabinowitz opined that S.Y. required an age-specific program with "a specific and narrow area of expertise" that could treat S.Y.'s "trauma prior to adoption and subsequent attachment issues; learning disabilities; severe DMDD; and increasingly difficult social interactions," She added:

> The potential negative impact of the wrong milieu on a susceptible young child could be devastating. Narrowly tailored programs like [Intermountain's] are uncommon, and not available in every part of the country.

Dr. Rabinowitz also opined, "It is recommended/expected that treatment will continue for up to 1 ½ years."

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the

allegations of this paragraph refer to medical records or documents which speak for themselves,

to the extent they exist, and Defendant refers to them for their true and correct contents.

36.     Intermountain's clinical records, submitted with S.Y.'s appeal, confirm that S.Y. continued to exhibit signs of severe mental illness, including explosive and threatening behaviors, while at Intermountain. For example:

> a. February 8, 2021 (Autumn Smith, Counselor I): "Types of Behaviors Client Displayed: agitation, arguing, …, disruptive, …, inappropriate language/gesture, instigating, non-compliance, …, stalling/ avoiding, tantrum, verbal aggression, [and] withdrawal . . . [S.Y.] became resistant… "Client behaviors and interactions in session…agitated, anxious, argumentative, …, demanding, disruptive, distracted, energetic, fidgeting, frustrated, helpless, impulsive, interactive, irritable, motivated, oppositional, … resistant, tearful."

b. February 9, 2021 (Cait Corso, Mental Health School Support I): "Types of Behaviors Client Displayed: agitation, anxious, arguing, inappropriate language/ gesture, non-compliance, stalling/ avoiding, tantrum"; "Summary of Client's Behaviors and Staff's Intervention During Shift: ... [S.Y.] had knitting needles in her room, ... [was] asked ... to please put this in her doorway as she was not supposed to have this in her room. [S.Y.] began to argue this ... refuse[d]... and started to yell and cuss..."

c. February 9, 2021 (Zach Richards, Counselor III): "Types of Behaviors Client Displayed: agitation, arguing, …, disruptive, …, inappropriate language / gesture, manipulation, non-compliance, odd behavior, …, stalling/ avoiding, tantrum..."; "Summary of Client's Behaviors and Staff's Intervention During Shift: [S.Y.] started out the afternoon refusing to stop/ think ...[S.Y.] told Zach "to 'shut the fuck up'" and the "cycle lasted for most of the afternoon...she refused to walk with him...she was starting to tantrum more and banging her head on the door...avoided underlying emotions that led to the reaction..."; "Client behaviors and interactions in session...agitation, arguing, …, disruptive, …, inappropriate language / gesture, manipulation, non-compliance, odd behavior, …, stalling/avoiding, tantrum...'"

d. February 11, 2021 (Dr. Phillip Hash, D.O., Ph.D., treating psychiatrist): " "…Had to be escorted out of her room by Zach and was yelling, screaming, crying..."; "Family Therapy: Parents wanted to know what was hard around [an] issue …. Attempted to throw an object at Mary's [therapist's] face and then destroyed Mary's office…"

e. February 18, 2021 (Taylor Ehl, Support Counselor): "Types of Behaviors Client Displayed: agitation,…"; "Summary of Client's Behaviors and Staff's Intervention(s) During Shift:...[S.Y.] struggled during the transition outside...began to tantrum and struggled to accept any support …" […and "struggled to talk about the shame that she was experiencing and eventually began to cry..."

f. February 18, 2021 (Tyler Smith): "Types of Behaviors Client Displayed: agitation, arguing, disheveled, disruptive, lethargic, manipulation, non-compliance, odd behavior, … stalling/ avoiding, tantrum, verbal aggression, withdrawal. . . . "; "Summary of Client's Behaviors and Staff's Intervention(s) During Shift: ...[S.Y.] became combative and rude . . . interrupting and being rude to adults... [S.Y.] began to cry and yell …."

g. February 25, 2021 (Dr. Hash): "Per staff: . . . attitude prior to ski trip and fears around the trip and didn't get to go . . . threw her snow gear and was rude. . . . . Monday she had a blow up following her talk on the phone with her mom…"

h.  February 25, 2021 (Taylor Ehl): "Types of behaviors client displayed: agitation, anxious, arguing, disruptive, manipulation, non-compliance, odd behavior, physical aggression, stalling/ avoiding, tantrum, verbal aggression. . . . "; "Summary of Client's Behaviors and Staff's Intervention(s) During Shift: . . . S.Y.] became frustrated when Taylor could not get her what she needed immediately and refused to talk . . . [S.Y.] continued to be rude and . . . attitude . . . tantruming similar to a toddler on her bed. [S.Y.] struggled to calm and would have moments before becoming dysregulated again. . . continued to tantrum . . . [S.Y.] became more dysregulated and . . . attempting to scratch herself . . . [S.Y.] then began to state that she was having flashbacks and she physically became more dysregulated . . . . "

i.  February 27, 2021 (Taylor Ehl): "Client behaviors and interactions. . . . ; agitated, anxious, argumentative, demanding, detached, disruptive, fidgeting, frustrated, impulsive, irritable, resistant, somatic, tearful."

j.  March 4, 2021 (Dr. Hash): "Per staff: . . . outbursts/ tantrums. Tantrums seem to be centered around feedback and . . . being unable to hear them."; "additional notes: . . . will still have tantrums when unable to accept feedback. . . ."

k.  March 6, 2021 (Taylor Ehl): "Types of Behaviors Client Displayed: agitation,..., withdrawal . . . [S.Y.] began to tantrum . . ."; "Client Behaviors and Interactions in session . . . agitated, anxious, argumentative, crude, demanding, disruptive, frustrated, helpless, impulsive, irritable, oppositional, resistant, tearful."

l.  March 7, 2021 (Zach Richards): "Types of behaviors client displayed: agitation, arguing, disruptive, manipulation, non-compliance, odd behavior, stalling/ avoiding, tantrum, withdrawal"; "Summary of client's behaviors and staff's intervention during shift: . . . [S.Y.] became defensive and rude while trying to set up what seemed to be arguments . . . [S.Y.] became verbally rude . . .g[o]t Zach so they could escort [S.Y.] in the building as she was refusing to walk in hand. Zach gave [S.Y.] the option to walk in with him or Autumn but she needed to stop leaning . . . [S.Y.] refused to do this so . . . , at this point [S.Y.] was still refusing to go inside . . . . Both Autumn and Zach initiated a 2 person CPI transport which [S.Y.] said she would walk, however, when given the opportunity to do so she would just drop to the ground. This cycle lasted for about an hour, with both …[clinical staff] working hard to give [S.Y.] options to walk in the building on her own...once in the milieu again started to refuse to sit... 1 person CPI transport to the couch, as he escorted her to sit by him. She asked for her water bottle …he would get her a glass of water because he was not sure what she was going to do with the water bottle. . . , she poured it out on to the floor . . . [S.Y.] struggled to directly express what she was feeling outside other than feeling "rejected' . . . also did not take any accountability for her choices of refusing to come inside. . . . [S.Y.] struggled and started to get defensive . . . Eventually, . . . [S.Y.] checked in … how she was worried . . . , about her mom.

m.  March 9, 2021 (Zach Richards): "Client Behaviors and interactions in session . . agitated, anxious, argumentative, crude, demanding, disruptive, energetic, fidgeting, frustrated, hopeless, impulsive, irritable, oppositional, resistant, tearful."

n.  March 10, 2021 (Taylor Ehl): "Types of Behaviors Client Displayed: agitation, arguing, disruptive, non-compliance, odd behavior, regulated, stalling/avoiding, tantrum, verbal aggression, withdrawal . . ."; Summary of Client's Behavior(s) and Staff's Intervention During Shift: . . .[S.Y.] struggled and didn't want to join the cottage for group therapy . . .[S.Y.] struggled after group therapy . . .[S.Y.] continued to become more dysregulated and refused to talk. . . .[S.Y.] struggled to show that she could be safe...[S.Y.] became dysregulated and . . . refused to shower. [S.Y.] sat underneath the table in the dining room . . . .[S.Y.] would not say anything until Taylor walked away... and this would happen multiple times . . ."; S.Y. "did not participate in physical activity today . . . due to . . . unsafe behaviors."

o.  March 30, 2021 ("Treatment Plan Review"): "Discharge Plan: The discharge plan is for [S.Y.] to return home to her parents' care once treatment has been completed. [S.Y.] will have to work through her explosive and . . . aggressive behaviors to the degree she can safely maintain in the home environment. She will also have to work on her relationship with parents and sibling, demonstrating that she can be safe in the home, school, and community settings. She will need to express her emotions in a safe and adaptive manner. Estimated length of stay updated to 12 months ..."; "Transition Plan: . . .Anticipated discharge as soon as possible without disrupting integrity of treatment . . . ."

p.  March 11, 2021 (Dr. Hash): Dr. Hash summarized S.Y.'s hour-long struggle with staff on March 7 and noted that S.Y. was struggling academically and displaying a lack of motivation in school.

q.  March 20, 2021 (Taylor Ehl): Behaviors: ". . . tantrum, withdrawal" "[S.Y.] struggled during her phone call . . .[with] mom . . . became defensive and . . . shut down for the remainder of the call. [S.Y.] tantrum after her phone call and was two person CPI transported . . . out of the office."

r.  April 7, 2021 (Treatment Review): "Prognosis: The prognosis to return to a less structured family and home environment at this time is guarded . . ."; ". . . she has gestured [threatened] and has come quite close [to injuring someone]."; "Justification for this level of care: [S.Y.] has had some struggles (...aggression) in the last quarter and . . . intensify/escalate as she gets into the core of her work, especially with more family involvement. Were [S.Y.] to discharge at this time in treatment, she would … revert back to maladaptive and unsafe ways of handling her emotions."

s.  April 20, 2021 (Mary Huigen, therapist): "Therapist will continue to support [S.Y.'s] exploration around her vulnerable feelings of [being a] 'crappy kid.'"

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

37.     By letter dated May 6, 2021, Aetna, on behalf of the Plan, denied S.Y.'s ERISA appeal and affirmed its coverage denial decision, asserting as rationale, *inter alia*:

> …there is no documentation of the member being suicidal, homicidal, explosive, or severely depressed. There is no documentation of member reporting any auditory or visual hallucinations. [S.Y.] has been medically stable. It is documented that she engages in "eye-rolling and sassiness" and kicks objects when frustrated. [S.Y.] has no behaviors dangerous to herself or others. There is no indication that the treatment plan has altered significantly over the course of treatment. Member appears to be at [their] baseline…The intensity of member's symptoms was not intense enough to require 24 x 7 monitoring, [they were] not considered a risk to inflict harm on self or was experiencing mood and cognition changes that prevented [them] from performing activities of daily living. Treatment could be provided at an alternative (ALOC) less intensive level of care or in another setting. Denial is upheld as LOCA T 5 criteria support routine outpatient with family work as the medically necessary level of care.

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

38.     By letter dated June 4, 2021, Aetna also denied S.Y.'s appeal of Aetna's decision to cover Intermountain's treatment at the in-network coverage level from September 30, 2020, through February 3, 2021, even though no other appropriate treatment facility existed in a "geographically accessible area," which Aetna defines as a "bordering county that is within approved time and distance standards."

**ANSWER:** Denied. It is admitted that Aetna denied Plaintiff's challenge to certain payments Aetna had made on or about June 4, 2021.  All further allegations are denied.  By way of further response, the allegations refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

**39.** Despite its categorical denial of coverage of Intermountain's treatment of S.Y. and the denial of an in-network level of coverage for the first 5 months of S.Y.'s treatment, Aetna deemed Intermountain an in-network provider in EOBs issued to S.Y. for Intermountain's residential treatment of S.Y. effective on or about December 26, 2021. Once Intermountain became an in-network provider, Aetna changed its rationale, asserting in EOBs that it had denied Intermountain's treatment of S.Y. based on a lack of prior authorization.

**ANSWER:** Denied. The allegations of this paragraph are denied. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

**40.** Intermountain's clinical records from May 2021, through its discharge of S.Y. on January 17, 2022, document continuing symptoms of S.Y.'s ongoing, severe mental health problems, including mood dysregulation and behavioral problems, which sometimes escalated to violence, including, inter alia:

  a. May 6, 2021 (Dr. Hash): "On her phone call she blew up when Taylor asked her and family to take a risk and explore feelings not overly deep, but check in about their feelings. [S.Y.] instantly began to argue, resist, and call Taylor "stupid." Taylor was firm with her limits around how [S.Y.] was treating her. [S.Y.] continued to smack her mask and posture her body, so Taylor ended the call and then switched with Tyler [a larger staff member] as ending the call caused [S.Y.] to escalate more."
  b. May 21, 2021 (Mary Huigen): "Client behaviors and interactions . . ." Anxious, Disruptive, Frustrated, Impulsive, Resistant, Tearful."
  c. June 9, 2021 (Mary Huigen): "Client behaviors and interactions . . . "Agitated, Anxious, Argumentative, Crude, Disruptive, Frustrated, Impulsive, Irritable, Oppositional, Resistant, Tearful"; "When pushed by therapist she [S.Y.] became rude and resistant and spoke rudely to her mom. Therapist put a limit on this and offered several opportunities for [S.Y.] to calm, all of which she refused loudly. Therapist offered her mom an opportunity to express how this feels for her and [S.Y.] became extremely rude and aggressive by hitting the couch, table and seat next to her mom. Therapist interrupted, set a firm limit on safety and got a male staff to escort her out which she struggled with."
  d. June 10, 2021 (Dr. Hash): S.Y. "[h]ad major outburst in therapy and had to be removed."
  e. June 15, 2021 (Mary Huigen): S.Y.'s "behaviors and interactions" during a therapy session with her mother present were "Agitated, Anxious, Argumentative, Disruptive, Frustrated, Impulsive, Irritable, Resistant"; "[S.Y.] continued to show some . . . aggression, . . . [had] difficulty with a verbal contract for verbal and physical safety with her mom."
  f. June 17, 2021 (Dr. Hash): "more reactive and irritable."

g.  June 21, 2021 (Dr. Hash): "Recent increase in aggression. Almost hit mother."

h.  June 23, 2021 (Mary Huigen): In family therapy, ". . . [S.Y. had an] aggressive attitude that threatens others that she might get more dysregulated"; "everyone in the family is anxious about [S.Y.]'s . . . attitude and physical aggression and work very hard to avoid this."

i.  June 26, 2021 (Mary Huigen): "Client behaviors and interactions...: Agitated, Anxious, Argumentative, Compliant, Crude, Demanding, Detached"; "[S.Y.] struggled with therapist reflection . . . became upset, calling therapist names and getting loud with crying and yelling."

j.  June 27, 2021 (Mary Huigen): "[S.Y.] struggled to transition into the session. She became frustrated and angry with therapist using swear words and aggressive attitude to effectively delay the session. She denied feeling nervous about spending the time with Aden and denied that she had any feelings at all, just that therapist was being annoying. . . . [S.Y.] had a tantrum."

k.  July 9, 2021 (Dr. Hash): "Conflict within family remains high."

l.  September 2, 2021 (Mary Huigen): ". . . review of a struggle that [S.Y.] and Debbie had during the last visit when [S.Y.] kicked Debbie."

m.  September 16, 2021 (Dr. Hash, annual review):
    "Demeanor: Guarded..."
    "Impulse Control: Fair"
    "Insight: Absent"
    "Intelligence Estimate: Borderline"
    "Judgment: Poor"
    "Current Risk Factors: Danger to Others...Parents report explosive anger with some aggression toward mother particularly. [S.Y.] reports anger with an inability to stop it once it gets too big. This includes yelling, throwing, arguing, pouting and shutting down."; ". . . Additional Current or Historical Risk Factors: Increasing Anxiety Increasing Hopelessness, Significant Worsening of Family Functioning . . . ."

n.  September 29, 2021 (Victoria Ward, school staff): "Types of Behaviors Client Displayed: Agitation, Arguing, . . . Disruptive, . . . Non-Compliance, . . . Stalling/Avoiding, Tantrum, Withdrawal."

o.  November 7, 2021 (Zach Richards): "Types of Behaviors Client Displayed: Agitation, Arguing, . . ., Manipulation, Odd Behavior, . . . , Stalling/Avoiding, Tantrum"; "[S.Y.] struggled to verbalize more than just one word descriptions of how she was feeling. When her mom attempted to explore this further with [S.Y.] she became rude and defensive towards mom. Zach …expressed that this was one of the opportunities when she is uncomfortable to take risks and talk about how she was feeling. [S.Y.] refused to talk . . . , Zach encouraged her to take this time to express needing a break from the conversation or to let her family know it was too hard to talk about right now, though [she] remained silent. Zach . . . was going to have the call be over as it seemed like this was [S.Y.]'s attempt to control

the situation. At this point, [S.Y.] started to ball up her fists and became angry towards Zach for 'cutting her off' …"

p. December 1, 2021 (Autumn Pierce): "Types of Behaviors Client Displayed: Agitation, Arguing, …, Difficulty Falling to Sleep, Disruptive, Non-Compliance, …, Stalling/Avoiding, Tantrum, Withdrawal."

q. December 5, 2021 (Taylor Ehl): During home visit "[S.Y.] struggled to regulate herself ... [S.Y.] would call her mom names and break down into a crying tantrum. [S.Y.] needed to utilize Taylor's support . . ."

r. December 5, 2021 (Zach Richards): "Mary [therapist] texted Zach about needing some help as [S.Y.] was becoming unsafe in [family] therapy."

s. December 7, 2021 (Mary Huigen): During family therapy session "[S.Y.] began to call names, blame and show emotional regression with a tantrum that included threats to throw things and disrupting office items."

t. December 9, 2021 (Dr. Hash): "Back from home visit. Did not do well after support staff left. Made threats towards mom. Also had outburst towards staff."

u. December 11, 2021 (Taylor Ehl): "Types of Behaviors Client Displayed: Agitation, Arguing, Disruptive, Manipulation, Non-Compliance, Odd Behavior, Stalling/Avoiding, Withdrawal"; "Client behaviors and interactions in session or as reported by parent and/or legal guardian: Agitated, Anxious, Argumentative, Detached, Distracted, Frustrated, Irritable, Resistant, Tearful."

v. December 12, 2021 (Zach Richards): "Client behaviors and interactions…: "Agitated, Anxious, Argumentative, Compliant, Detached, Disruptive, Frustrated, Impulsive, Interactive, Irritable, Resistant, Tearful."

w. December 16, 2021 (Dr. Hash): "Chief Complaint: explosiveness."

x. December 18, 2021 (Dr. Hash): "[had] . . . 'explosion' on her birthday."

y. December 18, 2021 (Taylor Ehl): "Debbie called . . . [during a home visit] ... stating that [S.Y.] blew up, tearing her birthday decorations down and throwing her presents down the stairs . . . this is part of the reason why she is not going home as there is still a lot of work to be able to work together as a family and [S.Y.] plays a part in that."

z. January 1, 2022 (Zach Richards): "Types of Behaviors Client Displayed: Agitation, Arguing, . . ., Disruptive, Manipulation, Odd Behavior, Stalling/Avoiding, Withdrawal."

aa. January 6, 2022 (Taylor Ehl): "Types of Behaviors Client Displayed: Agitation, Arguing, Disruptive, Manipulation, Odd Behavior, Withdrawal."

bb. January 12, 2022 (Schuyler Freeman, Discharge notes): ". . . she had explosive emotional reactions when alone with her mom, calling her mom 'a stupid bitch' and was passive aggressive and verbally aggressive with her father during an off-campus visit stating that she wished 'he would drive off a cliff and die'"; "Documentation: Note: [S.Y.] primarily directs her maladaptive behaviors toward her mother, including being emotionally aggressive or abusive."

**ANSWER:** Denied. The allegations of this paragraph are denied because, after reasonable investigation, Aetna is without sufficient knowledge or information to form a belief as to the truth of the allegations herein. By way of further response, the allegations of this paragraph refer to medical records or documents which speak for themselves, to the extent they exist, and Defendant refers to them for their true and correct contents.

41.     On January 17, 2022, upon the advice of appropriate experts, S.Y. was discharged from Intermountain and transferred and admitted to Moonridge Academy ("Moonridge"), an RTC in Cedar City, Utah.

**ANSWER:** Denied. After reasonable investigation, Aetna is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 41 and denies same.

42.     S.Y. continues to receive mental health treatment at Moonridge, but at a stepped-down level of care, as part of a continuum of treatment planned by S.Y.'s treating and consulting experts, in consultation with her parents, that is intended to facilitate S.Y.'s safe return to her home and family.

**ANSWER:** Denied. After reasonable investigation, Aetna is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 41 and denies same.

43.     Aetna, on behalf of the Plan, approved coverage of S.Y.'s treatment at Moonridge. In fact, Aetna not only approved Moonridge's treatment of S.Y., but also increased its coverage to the in-network level effective February 2022.

**ANSWER:** Admitted in Part, Denied in Part. It is admitted only that Aetna has approved coverage for certain services S.Y. received at Moonridge. Those services and claims are not alleged with specificity, and thus Aetna is without knowledge or information sufficient to form a belief as to the truth of the allegations herein and denies. Same. The remainder of the allegations are denied. Plaintiff's characterization of the "level" of coverage is specifically denied.

44.     S.Y. has completed all steps required prior to the filing of this Complaint under the Plan and under ERISA, pursuant to 29 U.S.C. § 1133.

**ANSWER:** Denied. The allegations of this paragraph constitute conclusions of law to which no response is required and are denied.

## CLAIMS

### FIRST CLAIM –FOR BENEFITS AND ENFORCEMENT
### OF RIGHTS UNDER ERISA § 503(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

46.     S.Y. realleges paragraphs 1 through 44.[3]

**ANSWER:** Defendant repeats each and every response to each and every allegation set forth in paragraphs 1-44 of this Answer as if fully set forth herein.

47.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to "recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no response is required and are denied.

48.     By denying S.Y.'s claim and benefits under the Plan, Aetna violated ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no response is required.  To the extent a response is required, Defendant denies the allegations set forth in this paragraph and specifically denies that Plaintiff is entitled to any relief.

49.     S.Y. is entitled to recover benefits due to her for the period she was treated at Intermountain, from September 14, 2020, to January 17, 2022, as the result of Aetna's erroneous and arbitrary denial decision, in accordance with the terms of the Plan and ERISA.

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no response is required.  To the extent a response is required, Defendant denies the allegations set forth in this paragraph and specifically denies that Plaintiff is entitled to any relief.

---

[3] The Complaint is missing paragraph 45. (Compl. p. 21).

## SECOND CLAIM – FOR OTHER EQUITABLE RELIEF
### ERISA § 503(a)(3), 29 U.S.C. § 1132(a)(3)

**50.**     S.Y. realleges paragraphs 1 through 49.

**ANSWER:** Defendant repeats each and every response to each and every allegation set forth in

paragraphs 1-49 of this Answer as if fully set forth herein.

**51.**     ERISA § 503(a)(3), 29 U.S.C. § 1132(a)(3), provides that a participant or beneficiary may obtain other appropriate equitable relief to redress violations of ERISA or enforce plan terms.

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no

response is required.

**52.**     To the extent full relief is not available under ERISA § 503(a)(1)(b), 29 U.S.C. § 1132(a)(1)(B), S.Y. seeks all equitable remedies including, without limitation, unjust enrichment, disgorgement, restitution, surcharge and consequential damages arising out of Aetna's breach of its fiduciary duties and failure to administer the Plan according to its terms.

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no

response is required.  To the extent a response is required, Defendant denies the allegations set

forth in this paragraph and specifically denies that Plaintiff is entitled to any relief.

## THIRD CLAIM – FOR ATTORNEY FEES AND COSTS
### ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1)

**53.**     S.Y. realleges paragraphs 1 through 52.

**ANSWER:** Defendant repeats each and every response to each and every allegation set forth in

paragraphs 1-52 of this Answer as if fully set forth herein.

**54.**     S.Y. is entitled to an award of her attorney fees and costs under ERISA § 302(g)(1), 29 U.S.C. § 1132(g)(1).

**ANSWER:** Denied.  The allegations of this paragraph constitute conclusions of law to which no

response is required.  To the extent a response is required, Defendant denies the allegations set

forth in this paragraph and specifically denies that Plaintiff is entitled to any relief.

WHEREFORE, Defendant demands judgment in its favor, respectfully requests that the Court deny Plaintiff the relief requested, and seeks attorney fees and costs under ERISA 29 U.S.C. § 1132(g)(1) and common law, together with any other relief the Court deems appropriate.

## GENERAL DENIALS

1.      All allegations not specifically admitted or responded to are denied.

2.      Defendant reserves the right to amend or supplement its responses to the allegations above or any of the Affirmative Defenses below as appropriate.

## AFFIRMATIVE DEFENSE

Aetna asserts the following affirmative defenses, without assuming the burden of proof for any defense except as required by law.

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      Plaintiff's claims are barred due to Plaintiff's failure to exhaust administrative remedies.

3.      Plaintiff's claims are barred by the applicable statute of limitations and/or contractual limitations.

4.      Plaintiff's claims are barred by the doctrines of laches, waiver, estoppel, and/or ratification.

5.      Plaintiff is not entitled to attorneys' fees.

6.      Defendant's decisions were otherwise in accordance with the terms of ERISA and the subject health plans.

7.      The Complaint fails to sufficiently plead an actionable ERISA claim.

8.      Plaintiff's claims are barred by the applicable health plans, as well as the exclusions, conditions, declarations, definitions, and limitations of the health plans, all of which are incorporated by reference as if set forth in full.

9.      To the extent Plaintiff has failed to mitigate damages, Plaintiff is not entitled to relief.

10.      Plaintiff has failed to meet all conditions precedent for pursuing a legal action and claiming any entitlement to benefits under the plans.

11.      Defendant asserts and incorporates every provision of the relevant health plans that may be construed as an affirmative defense.

12.      Plaintiff's charges exceed the amounts payable under the relevant health plans.

13.      All relevant actions taken by Defendant were made in good faith compliance with the applicable laws, rules and regulations based on all relevant facts and circumstances known to Defendant at the time and in keeping with the best interests of the plans' participant at issue, and were not based upon any unlawful consideration or otherwise the result of ill will or unlawful motive.

14.      Plaintiff's claims are barred in whole or in part by Plaintiff's own actions.

15.      Plaintiff's claims are barred by the doctrine of accord and satisfaction.

16.      Plaintiff's claims are barred to the extent caused by third-parties.

17.      Plaintiff's claims are barred in whole or in part to the extent it is not the real party in interest.

18.      Plaintiff's claims are barred by the doctrines of setoff and/or recoupment.

WHEREFORE, Defendant demands judgment in its favor, respectfully requests that the Court deny Plaintiff the relief requested, and seeks attorney fees and costs under ERISA 29 U.S.C. § 1132(g)(1) and common law, together with any other relief the Court deems appropriate.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

<u>/s/    John A. Wait</u>
By:      John A. Wait (JW-9418)
          Benjamin H. McCoy*
          101 Park Avenue, 17th Floor
          New York, New York, 10178
          (212) 878-7900
          jwait@foxrothschild.com
          bmccoy@foxrothschild.com

          *Attorneys for Defendants*

          *\*Application for Pro Hac Vice*
          *Admission forthcoming*

Dated: February 21, 2023

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date a true and correct copy of the Defendant's Answer and Affirmative

Defenses was served upon counsel through the Court's electronic filing system.

Dated: February 21, 2023        By:    */s/ John A. Wait*
                                       John A. Wait